G. W. McKEE, Sheriff, *v.* JACOB LINEBERGER.

Proof without allegation is as ineffective as allegation without proof: *Hence,* The Court cannot take notice of any proof unless there be a corresponding allegation.

A sheriff selling land under execution, may maintain an action in his name against the purchaser for the amount bid, upon tendering a deed for the land sold.

The relation of creditor and debtor exists between the sheriff and such purchaser, by force of contract of sale, and the sheriff is left to enforce his rights by the usual remedy of action, unless he elects to rescind the contract of sale and sell the land again.

Nor is it necessary to enable the sheriff to bring such action, that he should first make a return of the sale on the execution.

A bidder at a sheriff's sale occupies a relation altogether different from a bidder at a sale made by order of a Court of Equity. In the flatter case, the Court takes the bidder under its protection and control, and manages the whole proceeding until the sale is in all things carried into effect: *Whereas,* In the former the sheriff makes the sale by himself, without any confirmation or other act of the Court, and acts by force of a statutory power to sell, &c.

A bidder at a sheriff's sale of a tract of land, known as the "Neagle tract," cannot avoid his bid, because the sheriff refused to convey a narrow strip of land and mill site and water power adjoining the same, and which the sheriff did not sell, although such water power, &c., was some six months before the sale, advertised as belonging to the "Neagle Tract."

CIVIL ACTION, at first commenced in Gaston county, and thence regularly removed to LINCOLN, where it was tried before *Logan, J.*, at Spring Term, 1873.

The following is the case, signed and sent by the counsel of the parties, with the record to this Court.

This is an action brought by the plaintiff in his official capacity as sheriff of Gaston county, to recover of defendant the amount of a bid made by him for a tract of land sold by plaintiff at a judicial sale under a *venditioni exponas*, and which bid the defendant after said sale refused to pay.

The plaintiff in his own behalf testified that having in his hands a *fieri facias* against H. W. Rumfelt, Wm. R. McLean and J. E. Neagle, returnable to the Spring Term, 1869, of Gaston Superior Court, and before levying and advertising the lands of defendant, Rumfelt, for sale, he summoned Wm. McKee, Rufus J. Beatty and James Wagstaff as commissioners to lay off to said defendant his homestead and personal property exemption; that he met said commissioners on the day appointed on the premises, and after administering the oath to them he left and did not return; that the lands of Rumfelt consisted of several different tracts all adjoining each other, and after laying off the homestead he advertised the same in written notices posted at the Court-house door, and three other public places in the county, to be sold on the 3d day of April, 1869; that at the request of said William R. McLean, he consented for McLean to make an advertisement in the Charlotte *Democrat*, in his, McKee's name, as calculated to attract the attention of a larger number of persons; that said Wm. R. McLean wrote the advertisement and procured its insertion in the *Democrat*, but witness was not positive as to whether he saw the advertisement in writing before its publication, but thinks he did. He saw it afterwards. The advertisement is in words and figures as follows:

" IMPORTANT SALE OF REAL ESTATE.—At the Court-house in Dallas, on Saturday, the 3d of April, 1869, I will sell that valuable tract of land known as the ' J. B. Neagle Tract,' on the Catawba river, containing 208 acres, more or less, with a good mill site and water power.

" Also one other tract, known as the ' Rumfelt Home-Tract,' containing 200 acres, more or less, on which is the well-known and valuable Rumfielt gold mine.

" Also one other tract, known as the McLean Gold Mine tract, containing 50 acres, more or less, levied on as the property of H. W. Rumfelt, to satisfy executions in my hands in favor of *J. M. Hutchison*, assignee, v. *H. M. Rumfelt*, *W. R. McLean* and *J. E. Neagle*. The above land will be divided to suit purchasers.    Terms cash.

" G. W. McKEE, Sheriff.

" March 1st, 1859."

" In regard to the valuable quality of the above lands, reference is made to W. F. Davidson, Esq., M. L. Wriston, Esq., and W. J. Yates, editor of the Charlotte *Democrat*."

Witness further testified that he did not sell the lands aforesaid on the 2d of April for want of bidders, and he made such return on the execution; from the Spring Term a *venditioni exponas* issued to sell the lands levied on, and he advertised them by notices posted as usual, but in them merely recited the J. B. Neagle tract as containing 208 acres, without saying anything as to a mill site and water power; on the 4th of October he offered for sale the lands of Rumfelt, stating the Neagle tract as containing 208 acres without mentioning a mill site and water power when the defendant at a single bid offered the sum of $2,625, and the same was knocked off to him at that sum; that shortly before the sale commenced, the defendant came to him and said he thought of bidding for some of the land, and wished to know if he did so, whether he would give him some little time in which to raise the money; and he agreed that he would

give him such time; after the defendant bid off the land he came to witness to know within what time he must raise the money, and two weeks were given as the time for the payment of the money; at the end of that time the defendant came to pay the money, alleging that he had it, and demanded a deed. After referring to the Register's books, plaintiff offered to convey the " J. B. Neagle tract " by metes and bounds of the original tract; but defendant insisted that they did not include the mill site and water power, which he alleged were the principal objects of his purchase, and if he did not get them, he did not want the land; plaintiff said he did not sell any mill site and water power to defendant; in fact, he did not know anything about them, but was willing to convey the J. B. Neagle tract of 208 acres as described in the original on the Register's books to which he had reference for the metes and bounds; defendant refused to take any such deed, and went off without paying his money; above six or eight week afterwards, and two weeks after Gaston Court, he, plaintiff, prepared a deed and went to defendant's house and tendered it to him, containing the 208 acres by the metes and bounds in the original deed, and demanded the amount of the bid; defendant asked if it contained the mill site and water power opposite the narrow strip of land; plaintiff told him it did not; the defendant replied he would not have it; witness then told him he had sold the narrow strip of land at the foot of the shoal to his father, Wm. McKee, and he, defendant, could get it for twenty-five dollars; defendant replied he had bought it once and did not wish to buy it again from a third person; plaintiff then told him that he had not yet made a deed to his father, and he could control the matter, and he would insert the mill site and water power in the deed if defendant would pay the money; defendant said he believed he would buy other lands with the money; he also testified that he had never been on the

land, and knew nothing about the shoal or mill site at that time; plaintiff thereupon left him.

Witness further testified that upon the *venditioni exponas* he had indorsed a return of the sale to Lineberger, and after he refused to pay he went into the clerk's office with the *venditioni exponas* and asked the advice of the clerk as to what he should do; the clerk told him he had no advice to give; that if he made a return it would be entered on the execution docket, and if he made no return it would be his duty to issue an *alias venditioni exponas*; he then asked the clerk if he could not make no return and let an *alias* issue and then sell the land again, and hold Lineberger responsible for the difference; clerk said he did not know; he must advise for himself; that he, the plaintiff, concluded to make no return, and took his pen and erased the return of sale already written upon the *venditioni exponas*; that he did not order any of the *alias fi fas* to issue, nor did his counsel; that the tendering of the deed was in accordance with the advice of his counsel obtained at Court after the sale; that he also said in the conversation with the clerk that he would strike out the return until he could see his counsel at Court; that the clerk did issue an *alias venditioni exponas* which was returned to the Spring Term, 1870; another returnable to Fall Term, 1870; and another to Spring Term, 1871, on which last he made returnable as follows: "The within named property, the fifty acre tract known as the Gold Mine tract, was sold, bid off by J. L. Rumfelt; the J. B. Neagle tract was sold and bid off by Jacob Lineberger, for which there is a suit now pending. The forty-three acres, part of the Mine tract, was bid off by William McKee."

Cross-examined—Prior to sale he had according to the Act of Assembly appointed John Smith and W. R. Rankin to appraise the land; they had made such appraisement, and he had it on day of sale, but after searching for it could

not find it—supposed it might be in the clerk's office; Lineberger's bid was three-fourths of the appraisement. He further testified that subsequent to his tender of a deed to Lineberger at the defendant's own house he did make a deed to his father for forty-three acres, which included the strip of land in controversy, which strip did not belong to the Neagle tract but belonged to the Lattimer tract.

Jacob Lineberger in his own behalf testified that in the Spring of 1869, he was looking about for a tract of land with a good water and mill site upon it with a view of purchasing it for the benefit of a son and one Wilson, a son-in-law; that the *Democrat* newspaper, containing the advertisement of the sale of J. B. Neagle's tract, and other lands of H. W. Rumfelt, over the name of plaintiff as sheriff was received by him, and he concluded to examine them; that he did not attend the sale of the land advertised for April, but learned soon after that the sale was postponed until October 4th, 1869; he did not see or look for any written advertisement of the property, as he had a printed description of the property in the Charlotte *Democrat*, and relied upon that, and had no reason to doubt its correctness; in July, he got a neighbor, Mr. Craig, who said he was well acquainted with the Neagle tract, to go with him to the premises and show him the lands and lines; Mr. Craig took him along the river and on the northern lines and on the west, and then down the southern side to the river; but stated that he was not well acquainted with the lines on the southern boundary, joining the Lattimer lands; witness saw the mill-dam fronting the Neagle lands, and a mill-house erected as a gold mill, but saw no other water power along the river front; above the dam being eddy or pond water nearly to the head of the shoal; soon thereafter he got one Kerr, who lived close by the Neagle tract, and who had carried the chain for Mr. Rumfelt on some survey, and professed to know, to go with him and show him the lands

and lines; he did so and pointed out all the lines Craig had shown him, and also those on the south side next the Lattimer tract, and upon reaching the branch lying between the Neagle and Lattimer tract followed the same to the river; he did not point out any part on the river side above the branch as belonging to the Lattimer lands, and from his showing defendant did not doubt but the mill site and water power opposite the Neagle land was part and parcel thereof; he did not go to Messrs. Yates, Davidson or Wriston, who were referred to in the advertisement; witness was satisfied with the land and water power and mill site, and concluded to buy it if it did not command more than he thought it was worth; he attended the sale, and had an interview with the sheriff, who agreed to give him time to raise the money if he should buy; when the Neagle tract was offered he bid for the same $2,625, the three-fourths of the value as appraised by the appraisers; after the sale the sheriff required him to bring the purchase money in two weeks; on his way home his son-in-law, Wilson, told him a conversation he had with Mr. Wm. McLean in relation to the water power after the sale, and he, Wilson, informing him that Wm. McKee claimed that he had purchased the water power and mill site, and that he had better look into the matter before paying the amount of his bid; that on the day appointed he carried the money to Dallas and told plaintiff he was ready to pay, upon the making on his part a proper deed; after some examinations, and conversation, sheriff said he had not sold to defendant the mill site and water power and he could not insert that in a deed, but would convey the J. B. Neagle tract, 208 acres, according to its boundaries as shown by the Register's books; witness refused to take such deed, saying that he had purchased the Neagle tract according to his advertisement, and the mill site and water power were the chief inducements to his purchase; plaintiff denied that he had put that advertise-

ment in the paper, or that he had sold under it; witness affirmed that he had bought under that advertisement, and if he did not get what he bought he would not pay; witness left and went home; some two or three weeks after the Superior Court, [plaintiff came to his house with a deed, and the conversation then occurred between them as recited in plaintiff's testimony.

Wilson, in behalf of defendant, stated that he was a son-in-law of defendant, and for him the proposed purchase was in part contemplated, knowing that defendant was desirous of buying a tract of land with a water power on it; after the adjournment of the sale of the land in the Spring of 1869, he received a copy of the *Democrat* containing the advertisement, and showed it to defendant; that he accompained defendant on his two visits to the land under the guidance of Craig and Kerr; saw the dam and steam mill house fronting the Neagle land, and did not learn from either of the guides, and did not doubt but the same were a parcel of the Neagle land; he saw no other water power opposite the Neagle land, for it was all pond and eddy water above on the shoal; about one week before the sale of October 4th, he carried his sorghum cane to the mill of William McLean, who lived close by the Neagle land, and Mr. McLean said to him he was glad Mr. Lineberger intended buying the land and erecting mills which would be a great convenience to the neighborhood; and that it would not cost much, as the dam was already built; he accompanied defendant to sheriff's sale, and heard the crier announce the Neagle tract containing 208 acres, &c., but he said nothing about mill site or water power; defendant bid for the same $2,625; the sheriff next offered a forty acre tract for sale as Rumfelt's property, and in his description said nothing as to water power and mill site; those were the only lands offered for sale; after the sale was concluded, William B. McLean said to him, now is the time for you to buy the

mill site and water power, as you can get it cheap ; he said Mr. Lineberger had bought it; Mr. McLean said no, Wm. McKee had bought it; witness was surprised at this information and communicated it to Mr. Lineberger on their way home and advised him to be cautious in paying over his money without getting a deed for what he supposed he had bought.

E. H. Wilson, for plaintiff, testified that he was clerk of Gaston Superior Court; that plaintiff came into his office with the *venditioni exponas* in his hand and said, " I have here some papers, I do not know what to do with them ; I have never been treated so before; that Lineberger had bid off the land and asked for a little time to pay the money, he had given it, and now he would not take it at all, and wished to be advised" ; witness refused to advise, but said if he made a return he would enter it on the execution docket, and if he made no return he should be bound, as his duty required, to issue an *alias venditioni exponas ;* plaintiff replied he believed he would call it no return, and cross out the return and let you issue new executions, and if I sell the land over again I will sell it at Lineberger's risk, like an administrator's sale, and he did put crosses over the return he had written on the executions and handed them in in that way ; other *aliases* were issued as if no return had been made ; that neither sheriff or plaintiff in execution or his counsel ever ordered him to issue ; that he did so because he supposed that was his duty ; plaintiff was at the time sheriff of Gaston, but had gone out of office in September last; the sale was on the 4th of October, and the Court met on the 7th November, 1869.

Moses H. Hana, for defendant, testified : He had been summoned as surveyor to aid the commissioners in laying off the homestead of H. W. Rumfelt, in the Spring of 1869 ; the commissioners instructed him not to include any of the gold mines or water power, as they agreed to allow only

15

arable land, 125 acres, at $8 per acre, for the homestead; they were too valuable and would bring much more for the creditors, and if they were included they should value the homestead over again; Rumfelt desired the homestead should be laid off the Lattimer lands, which lay south of the Neagle tract; the first day he laid off the tract, parcel of the Lattimer, containing 165 acres, but did not cross the branch between the Neagle and Lattimer lands above which was the water power; neither did he take in any of the gold mines; finding that his survey included too much, the commissioners directed him to take out 40 acres wherever Rumfelt directed them; he did so and laid off the 40 acre tract as so marked in the plat; that he never cut off the strip of land and annexed it to the Neagle tract; he further stated that the branch was near the dividing line between the Lattimer and Neagle lands; that in front of the lower end of the Neagle land there was a narrow strip of land which was part of the Lattimer land and the branch crossed the lower end of this strip; that this narrow strip was only two or three poles wide and thirty-four poles up the river; it was too narrow for the erection of proper buildings, roads &c., for the proper use of the water power, which stood on this strip and just below the upper corner and line of this small piece of land; that there was a dam erected below the upper line, five or six feet high which was built obliquely across the river up to the shoal and the larger part of the dam was opposite the Neagle land; there was a small mill house below the dam, but had not been driven by water; it was a gold mill and run by steam, not connected with the water power; there was no other water power that he could see, on the river front of the Neagle land, except where this dam stood; all above was pond water nearly to the top of the shoal. The witness was asked if he was not instructed by the commissioners, when laying off the homestead, to lay off this strip to be sold with the Neagle tract, as it would become

more valuable and bring more money for the benefit of the creditors? This was objected to. Defendant's counsel stated that they expected to show and satisfy the jury that the divisions of the lands made by the commissioner and surveyor was adopted by the sheriff in his sales in all respects. Objection sustained, and testimony ruled out. The witiness further testified, that on the first day of the survey, observing the directions of the commissioners, he had crossed the branch and included this narrow strip in his bounds of the 165 acres; Hana never ran around the strip at all, but only cut off 40 acres by the inside line joining the homestead; this necessarily cut off the strip with the 40 acre tract.

H. Rumfelt, for defendant, was defendant in the executions, and owned all the lands; he had built the dam now standing on the narrow strip of land several years since; it was built of logs and rocks, and ran angling up the river; the shore end of the dam abutted against a rock on the upper end of the narrow strip, and the larger part of it was opposite to the Neagle tract; the fall was about six feet at the dam, and there was no other water power opposite the Neagle land, as it was all eddy water from the dam; it was built for a saw mill; the mill house erected below the dam was used as a gold mill, and was driven by steam power. Was asked whether on the first trial of this suit in Gaston, the plaintiffs offered any evidence, or alledged that there was any other mill site or water power fronting the land except where the dam stood. Objected to, and ruled out.

Rufus Rankin, for defendant, stated that he and John Smith were called upon by the sheriff to appraise the lands of Rumfelt, with a view to the execution sale; they valued the Neagle land, including strip and water power at $3,500, and reported same to sheriff; they did not tell him particularly that they included the strip and water power.

J. B. Kerr, for plaintiff, had assisted Mr. Rumfelt to survey

the Neagle land when he bought it; had accompained Mr. Lineberger in 1869, when he viewed it; he showed him all the lines as he supposed, but did not tell him that the strip of land did not belong to the Neagle land, for he did not know it, but showed him all the courses, including the Water oak and White oak.

Wm. B. McLean, for plaintiff, lived near the Neagle land sixty years; knows all the lines, and knows that the strip is not a part of it, and never was a part of it; it always belonged to the Lattimer tract; he put the notice in the *Democrat* newspaper; there is a good water power on the Neagle land, 160 yards above strip of land, opposite to the Rock Island wheel house, with about as much fall as at Rock Island, three or four feet high; there are other water powers. and mill sites opposite to the Neagle land; the water power and mill site alluded to in the advertisement was the one 160 yards above the dam; did not think the water ponded back more than 160 yards; the part of the dam now remaining runs from the rock corner in the river diagonally to the island, and is all on the Neagle tract; he is one of the securities of Rumfelt, and his property was bound by the execution, and he put the advertisement in the *Democrat* to make the property bring as much as possible, and had paid for the advertisement himself; did have the conversation with William Wilson at his sorghum mill as recited by him, but did not tell him that the strip of land did not belong to the Neagle tract; was at the sheriff's sale.

Jasper Stowe, for plaintiff, has for many years been engaged with water powers; has known this shoal before and since this suit; the whole shoal is tolerable regular on the Gaston side where the Neagle land is, and is about 500 yards long the lower half being more steep than the upper; ascending from the present dam and about 160 yards above it, a fall of about twenty horse power may be had; 100 yards

above the dam, about twenty-five or thirty horse power, with three feet head; fifty yards above the dam is forty horse power; mill sites can be had at all these points along the shoal which have been spoken of, to run a grist and saw mill; twenty-five or thirty horse power is necessary; at the Rock Island mills on this shoal, on the Mecklenburg side, there is a fifty horse power with four and a half feet fall; two-thirds of the river is on the Neagle side in Gaston, the island in the river so dividing the current; most of the fall is from 160 yards above the dam down to the rock and dam.

On cross-examination witness stated that his views is based on the supposition that the present dam must be taken away; the present dam would destroy all the water powers above spoken of, with the dam standing as at present could not find any water above.

Plaintiff asked the Court to instruct the jury that the facts proved by Eli Withers, and the indorsements upon the executions given in evidence, do not, in law, constitute a waiver of the sale made by the plaintiff.

The defendant insisted:

1st. That this action cannot be maintained, the remedy being a motion for a rule in the original suit.

2d. That plaintiff having neither the right of property, nor possession, but simply a naked authority to sell, derived from a Court, cannot maintain this action.

3d. That plaintiff not having paid to the plaintiff in the execution the amount sought to be recovered, cannot maintain this action.

4th. The failure of the sheriff to make return of the alleged sale to the return term of the Court, and the subsequent issuing of *alias* and *pluries venditioni exponas* commanding the sale of the same property, and delivered to the present plaintiff as sheriff, was a legal waiver on the part of the plaintiff in the execution of any claim against the defendant for the purchase money.

5th. The plaintiff having agreed before the sale that the defendant should have time to pay the amount of any bid he should make, avoided the sale as contrary to the policy of the law.

6th. That if defendant made his bid under a mistaken belief, that the Neagle tract covered the strip of land lying between the Neagle tract and the river, and such mistake was induced by the representations of plaintiff, it would avoid the contract and defendant would not be required to pay his bid.

The following issues were submitted to the jury:

1. Did plaintiff falsely and knowingly mislead and deceive the defendant in the sale of the land mentioned in the pleadings?

2. Did defendant assume to pay the plaintiff the sum mentioned in the complaint as the price of the tract of land mentioned in said complaint?

3. Did the defendant bid for the property offered for sale under misapprehension on his part induced by the representation of the plaintiff, as to the extent of the land comprised in the name of the "J. B. Neagle tract?"

4. Did plaintiff, or plaintiffs, in execution under which the property was offered for sale, waive the bid made by defendant?

Defendant's counsel asked his Honor to charge the jury:

1. That this action cannot be maintained—the remedy being a motion for a rule in the original suit.

2. That plaintiff having neither the right of property, nor possesion, but simply a naked authority to sell derived from a Court, cannot maintain the action.

3. That plaintiff not having paid to the plaintiff in the execution, the amount sought to be recovered, cannot maintain the action.

4. The failure of the sheriff to make return of the alleged sale to the return term of the Court, and the subsequent

issuing of *alias* and *pluries* executions, commanding the sale of the same property, and delivered to the present plaintiff as sheriff, was a legal waiver on the part of the plaintiff in the execution of any claim against defendant for the purchase money.

5. The plaintiff having agreed before the sale that the defendant should have time to pay the amount of any bid he should make, avoided the sale as contrary to the policy of the law.

6. That if defendant made his bid under a mistaken belief that the Neagle tract covered the strip of land lying between the Neagle tract and the river, and such mistake was induced by the representations of the plaintiff, it would avoid the contract, and defendant would not be required to pay his bid.

His Honor charged the jury that the first issue is purely a matter of fact for the jury to determine from the evidence in the case. If you find that the plaintiff did *faslcly* and *knowingly* mislead and deceive the defendant in the sale of the land, that puts an end to the case. If you do not so find then you must consider the second issue which is the first of defendant's.

Defendant's first issue. This is also a question of fact for you to determine and say whether the defendant did assume to pay to plaintiff the sum mentioned in the complaint—$2,625—as the price of the tract of land mentioned in said complaint.

Second issue. You are to determine this issue upon the facts, governed by the principles of law laid down by the Court applicable to the facts therein contained. The first principle of law is that if one person has a better opportunity to know a certain fact than another, and makes a representation which the other accepts, is governed by and is injured, he is entitled to relief; therefore, you are to deter-

mine what knowledge each one had, or their opportunity of ascertaining the facts.

In the second place, if two persons have the same opportunity of ascertaining the facts, although a misrepresentation may be made by one as a matter of opinion, or to enhance the price, then the other would not be entitled to relief.

In the third place, if the person complaining of a misrepresentation, or misapprehension has a better opportunity to ascertain the facts than the person complained of, of course he is not entitled to relief.

The acts of the plaintiff alleged in the instructions prayed does not amount to a waiver of plaintiff's claim in the execution.

The foregoing were given to the jury, and the following reserved: It is the opinion of the Court that there is no evidence that the plaintiffs in the execution did any act amounting to a waiver of their claim. Nor could the defendant take advantage of the "avoidance" mentioned in the fifth instruction asked by defendant's counsel. It is also the opinion of the Court that the plaintiff could maintain his action as brought.

The jury found all issues in favor of the plaintiff, judgment rendering motion and rule for new trial. Rule discharged. Appeal prayed and granted. Notice waived.

*Wilson*, for appellants, argued :

I. That a motion in the original cause to compel defendant to comply with his bid was the proper remedy, and not an action by plaintiff to recover the amount thereof. *Council* v. *Rivers*, 65 N. C. Rep., 54; *Mann* v. *Blount*, Ibid., 100; *Mason* v. *Miles*, 63 N. C. Rep., 564.

II. That a bidder or purchaser at a master's sale in equity subjects himself to the jurisdiction of the Court, *quod hoc*, and can be compelled to perform his agreement specifically.

*Rogers* v. *Holt,* Phil. Eq., 108 ; *Harding* v. *Yarborough,* 6 Jones Eq., 215 ; *ex parte Yates,* Ibid., 306 ; *Blossom* v. *Railroad,* 1 Wallace, 615.

III. The fact that the sheriff failed to make a return upon the *venditioni exponas* and *alias* process issued to him in law was a waiver of the bid of defendant ; and that his Honor erred in his charge in this respect.  *Grier* v. *Yontz,* 5 Jones, 371.

IV. That the sheriff's duty required him to sell for cash, and consequently his agreement to give time for payment of the money was contrary to the policy of the law and void, for the reason that the law gave him no authority to do so. *State* v. *Johnston,* 1 Hay., 293.  Whenever an officer transcends his authority, his act is void.  *Jones* v. *Gibson,* Term Rep., 41.  As to what constitutes public policy, see Story on Sales, sec. 489.  A sheriff's deed fairly executed at any time after the sale under execution relates back to the sale, and operates to pass title from that time.  *Dobson* v. *Murphy,* 1 Dev.. & Bat., 586.

V. That the Judge below erred in excluding evidence that the sheriff adopted the action of the commissionners in attaching the strip of land along the river in front of the Neagle tract to it.  1st. The sheriff has the right in his discretion to sell land by the acre.  *Davis* v. *Abbot,* 3 Ired., 137. 2d. It is the duty of the sheriff to sell land in such a way as to bring the most money.  *State* v. *Moon,* 7 Ired., 387.

VI. That the charge of the Judge (the second proposition) is erroneous in law, and the jury misled thereby.  *Bynum* v. *Bynum,* 11 Ired., 632 ; *Smith* v. *Sasser,* 5 Jones, 388.

*Guion,* also for appellants, insisted that this action cannot be maintained—the remedy being by motion or rule in the original cause.  The Judge held that the plaintiff could maintain his action as brought.

The action is one virtually for the specific performance of

a contract, the sheriff being the vendor, and the defendant the purchaser. When the hammer is down, the contract is complete, and the parties mutually bound. Such is the law as to auction sales, and judicial sales are governed by the same rules of law. *Blossom* v. *Railroad*, 1 Wallace, 655; *Ibid*, 206. The case decide that a bidder at a judicial sale becomes a party in the cause with rights which the Court will protect if necessary; and will summarily compel him to execute his part of the contract, being a party to the cause. He cannot ask relief in another suit.

As to judicial sales, a bill for specific performance will not *lie*, a motion in the cause affording the most appropriate remedy. *Patrick* v. *Carr*, 1 Winst. Eq., 89; *Mason* v. *Osgood*, 64 N. C. Rep., 468; *Mason* v. *Miles*, 63 N. C. Rep., 564; *Rogers* v. *Holt*, Phil. Eq., 108; *Mann* v. *Blount*, 65 N. C. Rep., 99; *ex parte Yates*, 3 Jones Eq., 215.

An action to recover the amount of a bond given by defendant to the clerk and master for the purchase of a tract of land sold by him, was held not the proper remedy, as a motion in the cause afforded the proper relief.

2. The plaintiff having neither the right of property nor possession, but simply a naked authority to sell, derived from a Court, cannot maintain this action, showing no order or direction from the Court to sue. *Barden* v. *McKenzie*, 4 Hawks, 277; *Hill* v. *Child*, 3 Dev. 265; *Love* v. *Gates*, 2 Ired. 14. As to lands, the sheriff has not even a special property in the lands. An auctioneer having a special property may sue. The sheriff is but an officer of the Court acting under its mandate, and must report to the Court, if any special matter shall arise; and like a receiver or other authorized agent of the Court, must receive permission or authority before he can sue. If he has a right to sue of his own will, he may disappoint the wishes of the judgment creditor, and prevent a resale if that were deemed most advisable. He may, as in the present case, go out of office before the trial,

and afterwards receive the money and release his bondsmen, or, he may die and his executors or administrators receive the money. *Quere:* Would they be officers of the Court, and subject to its summary orders ?

3. Plaintiff can only maintain this action on the ground that he has either paid the money or is bound for it ; or that he is liable to pay it, for that he has been guilty of some dereliction of duty which subjects him to its payment. In either case the defendant is not liable. ·

What amount would the plaintiff in execution recover from the sheriff under facts of this case ? He may not be able to coerce the defendant to pay him the amount of his bid ; and the land has been uninjured and may be worth as much or more now than on the day of sale. *State* v. *Skinner,* 5 Ired. 411.

4. The issuing of subsequent *venditioni exponas* was a waiver of the right to call upon the defendant for specific performance. The facts on this point amount to an actual rescission of the sale by both parties. It is made the special duty of all clerks of Court, under a penalty, to issue executions and *aliases* within six weeks, unless otherwise directed by the plaintiff in the judgment. Rev. Code, ch. 45, sec. 29. In this case the sheriff concluded to make no return of the sale for the express purpose of having an *alias* to issue under which to resell the land as Rumfelt's property, and hlod the defendant liable for any loss. *Grier* v. *Yontz,* 5 Ired. 371.

The present case is not the first in this State. The orderly mode of proceeding when a purchaser refuses to make good his bid, is clearly and distinctly prescribed in the decisions of this Court : 1st, to make him pay the money, or 2d, to rescind the sale *in toto ;* or 3d, which is the middle course, to order a resale, with the distinct assent of the bidder that he will make good any loss that may occur by a resale. This is the course pursued upon the return made to the

Court and is upon motion of the party. *Ex parte Yates,* 6 Jones Eq. 212 and 306 ; *Harding* v. *Yarborough,* Ibid, in note ; and *Clayton* v. *Glover,* 3 Jones, Eq. 371.

Although the course and remedy are so distinctly announced by this Court and so just to all parties, this plaintiff has chosen to pursue a strategic course of his own conception. He sues the bidder as the owner of the property, and at the same time sues out of *venditioni exponas* to sell the property as Rumfelt's. He seeks his own safety in an illegal and inadmissible alternative. Such inconsistency of claims are not to be tolerated in a Court of Equity.

5. Defendant insists that a sale upon credit given to defendant by agreement made before the sale was void. The law of execution simply speaks of sales. Rev. Code chap. 45. But that term, *vi et termini* in law implies sales for cash; not even notes or bills of exchange can be substituted, unless so specially directed in the judgment or decree. By sec. 18, all sales made contrary to the true intent and meaning of that chapter subjects the officer to a penalty.

No action will be sustained in affirmance and enforcement of an executory contract to do an immoral act, or one against the policy of the law; the due course of justice or the prohibition of a penal statute. *Sharpe* v. *Farmer,* 4 Dev. & Bat., 121 ; *Beusley* v. *Bignold,* 5 B. & A., 335, (7 E. C. L., 121.) It is the policy of the law that all bidders shall stand upon an even footing at judicial sales.

6. That if defendant made his bid under a mistaken belief induced by the representations of the plaintiff, it would avoid the contract, and defendant would not be required to pay his bid. The Court in substance, charged the jury that if the defendant had as good or better opportunity than plaintiff to know whether the mill site and water power were a part of the Neagle tract, in fact, the misrepresentation of plaintiff would not entitle defendant to relief. The

mill site and water power had been a part of another tract of land, lying on a small and narrow strip between the lower end of the Neagle tract and. the river. It was in the sheriff's power, and it was his duty to have annexed it to the Neagle tract. He advertised that the mill site and water power were a part of the Neagle tract, and it appeared in fact to be so. No one could know better than the sheriff whether he had annexed, or intended to sell it with the Neagle land, and no reference to persons, deeds and Register's books or surveyors, could have given any one the same knowledge that the sheriff possessed. In *Flight* v. *Booth*, 1 Bing. N. C., 380, (17 E. C. L., 424,) the Court say : " In this state of discrepancy between the decided cases we think it a safe rule to adopt that where the misdescription, although not proceeding from fraud, is a material and substantial point, so far affecting the subject matter of the contract, that it may reasonably be supposed that but for such misdescription, the purchaser might never have entered into the contract at all ; in such case the contract is avoided altogether, and the purchaser is not bound to resort to the clause of compensation. Under such a state of facts the purchase may be considered as not having purchased the thing, which was really the subject of the sale. *Stamper* v. *Hawkins*, 6 Ired. Eq., 7 ; *Pugh* v. *Brittain*, 2 Dev. Eq. 34 ; *Good* v. *Hawkins*, Ibid., 393 ; *Newsom* v. *Buffalow*, 1 Dev. 39, 379.

In the sale of real property at auction care should be taken that the description of it be accurate, or the purchaser will not be held to a performance of the contract. 2 Kent Com. 537. "Admitting that a purchaser might by minute examination make that discovery (of the material deficiency) he was not driven to that examination, the other party having undertaken to make a representation. *Dyer* v. *Hargrave*, 10 Vesey 509.

The sheriff having advertised the property as he did in

the newspa'per for the purpose of inviting bidders to the sale of the property so advertised, should have made a correction of the description thus publicly given, and removed any false impression it had made. His real acquaintance with the property had nothing to do with the case; "whether a party misrepresenting a 'fact knew it to be false, or made it without knowing it were true or false is wholly immaterial," &c. 1 Story's Eq., par. 193, and cases cited.

*Schenck* and *Bynum,* contra :

The action is properly brought. *Tate* v. *Greenlee,* 4 Dev. Law 149, is a precedent directly in point, and it is cited and approved in *Grier* v. *Yontz,* 5 Jones 371.

The authorities cited by defendant to show that a motion in the cause was the proper remedy are all equity cases, where all the parties are before the Court and are making their own sale; but this is a sale *in invitio,* under process. See distinction taken in *Smith* v. *Brittain,* 3 Ired. Eq. 351. In *Council* v. *Rivers,* 65 N. C. Rep. 54, the Court says, "the remedy by order in the cause is a principle of equity."

The question of waiver is not raised by the pleadings, and it was error in the Court to submit to the jury. *Heileg* v. *Stokes,* 63 N. C. Rep. 612; *Rowland* v. *Thompson,* 64 N. C. Rep. 716; C. C. P., secs. 100 and 219. The error in the Court below in submitting irrevelant issues can only be taken advantage of after trial by appeal. Plaintiff may move now to strike them out. *School Committee* v. *Kesler,* 66 N. C. Rep. 323.

Credit given by sheriff does not invalidate the sale. See *Tate* v. *Greenlee,* supra. But this defense was not set up in the answer or by demurrer, and cannot be taken advantage of under sec. 99 C. C. P.; because it does not appear on the face of the complaint. The charge on the question of mis-

representation is fully sustained by *Walsh* v. *Hall*, 66 N. C. Rep. 233 ; *Lytle* v. *Bird*, 3 Jones 223.

The question of evidence raised is clearly untenable, because the appraisers had no right to annex the strip of land to another tract to enhance its value. Hana, the surveyor for the appraisers expressly swears that he did not attach the strip of land to the Neagle tract.

PEARSON, C. J. I. The legal effect of the fact that the *venditioni exponas* issued after the sale, on the last on which the plaintiff indorsed " the land sold under previous *venditioni exponas* action pending for the same bid." Do these facts amount to a waiver of the right of action against the defendant for the amount of his bid ? and the legal effect of the fact that the sheriff agreed to give the defendant a few weeks to raise the money, does this fact vitiate the sale? are questions not presented by the case, for there are no allegations by which to put these facts in issue. There must be *allegata et probata*, and under the new system as under the old, the Court cannot take notice of any proof, unless there be a corresponding allegation. Proof without allegation is as ineffective as allegation without proof. The record either as originally framed, or as made by amendment must set out the case as well on the part of the defendant as on the part of the plaintiff.

II. Can the sheriff who sells land under an execution maintain an action in his own name against the purchaser for the amount of his bid upon tendering a deed for the land sold ? This is settled, *Tate* v. *Greenlee*, 4 Dev., 149 ; *Grier* v. *Yontz*, 5 Jones, 371. Indeed, unless the sheriff can force payment of the bid by action it is difficult to see how he can execute the writ. At one sale the bidder fails to pay the cash, the sheriff lets him go, and after the necessary delay, makes a second sale ; the bidder fails to pay the cash, a third sale, and so on *ad infinitum*. If

upon tender of the money the sheriff refuses to make title, he can be put under a rule, for he is an officer of the Court. If the bidder upon a tender of the deed refuses to pay, he cannot be put under a rule, for the Court has given a *final judgment*. The execution is a mandate to the sheriff to make the money by sale, and the Court has no privity or connection with the bidder.. The relation of creditor and debtor exists between the sheriff and the bidder alone by force of the contract of sale, and the sheriff is left to enforce his rights by the usual remedy of action, unless he elects to rescind the contract of sale, and sell the land again, in which case, as in *Grier* v. *Yontz*, 5 Jones, 371, supra, he releases the bidder at the first sale.

It will be seen that a bidder at a sheriff's sale occupies a relation altogether different from a bidder at a sale made by order of a Court of Equity, either by its clerk and master or by a commissioner, for then the Court takes the matter into its own hands and makes the sale for the parties, holding the cause for further directions, taking the bidder under its protection and control, so as to relieve him from his bid if there be ground for it, or to compel him to perform his contract specifically, and managing the whole proceeding until the sale is in all things carried into effect, whereas the sheriff makes the sale by himself, without any confirmation or other act of the Court, and acts by force of a *statutory power* to sell, receive the price and make title; so the Court has no privity or control over the bidder, and the sheriff is left to his action. It will be noticed farther that this statutory power conferred on the sheriff differs "*in toto*" from a power to sell conferred by an individual; there the attorney sells in the name of his principal, receives the money and makes title in his name, whereas a sheriff sells in his own name, receives the money and makes title in his own name, and if the money is not paid he sues for it in his own name. By force of the contract of sale the title of the defendant in the

McKEE, Sheriff, v. LINEBERGER.

execution is divested, and the sheriff although he goes out of office, may execute the deed for title, and it relates back to the date of the sale. This is familiar learning.

III. Was it necessary for the sheriff to make a return of the sale on the execution as a condition precedent to his right of action? We can see no principle upon which this can be required; after the sale as soon as the sheriff tenders the deed, it is the duty of the bidder, by the terms of the contract, to pay the money, and his failure to do so gives a cause of action, and the judgment will be that the sheriff recover on filing in Court a proper deed. He may be put under a rule to make the return, but there is nothing in the policy of the law which forbids him from taking time (as in our case) to consult counsel.

IV. The sheriff sold the "John Neagle tract," and he tendered a deed for it; the defendant refused to accept the deed unless it was made also to include a narrow strip of land and the water power attached, which lies outside of the "John Neagle tract," and was a part of the Lattimer tract. This is the gist of the controversy.

It is proved that the sheriff offered for sale the "John Neagle tract," and that was bid off by the defendant, nothing being said about the strip of land or the water power, and afterwards the sheriff sold the strip and water power which was bought by a third person.

The defendant insists that by means of an advertisement made by the sheriff some time before, it was contemplated to make a sale which did not take place, the sale being made six months afterwards. He was under the impression that the strip of land and water power either formed a part of the John Neagle tract or was to be sold with it, and that his main purpose in bidding was to get the water power, and on this ground seeks to be relieved from his contract. To this the sheriff replies that the defendant had the same, if not better means of information than he had in regard

16

to the boundaries of the "John Neagle tract," which was all that he sold. The whole matter was submitted to the jury. We do not feel called upon to analyze the many generalities and abstract propositions set out by his Honor in the charge. It is sufficient to say it contains many truths and some errors taken in the abstract, but none that are applicable to the evidence which could by possibility have operated to the prejudice of the defendant, and upon the whole we are satisfied that the verdict does substantial justice, and do not feel called on to disturb it, in the absence of a distinct issue, which the defendant had it in his power to offer; that he was in fact misled, and believed the "John Neagle tract" embraced the strip of land and the water power, or that he believed he was buying it.

Per Curiam.                              Judgment affirmed.