VEDA FORD, BY HER NEXT FRIEND, HAROLEE FORD, v. BLYTHE BROTHERS COMPANY, INC.

(Filed 30 June, 1955.)

**1. Appeal and Error § 29—**

Assignments of error not brought forward and discussed in the brief will be deemed abandoned. Rule of Practice in the Supreme Court No. 28.

**2. Negligence § 4b—**

A condition need not be an attractive nuisance *per se* in order for the owner of the land upon which the condition is maintained to be liable for the injury of a child on the premises, but if the owner knows or by the exercise of ordinary care should know that the premises are frequented by children of tender years, it becomes his duty to exercise ordinary care to provide such children reasonably adequate protection from injuries which can be reasonably foreseen.

**3. Same—**

Clearing, grading and excavating operations upon land are *held* not to constitute an attractive nuisance *per se.*

**4. Same—**

A 3-year-old child was burned when she walked into a bed of ashes containing live coals beneath the surface. Defendant, who was doing the clearing and grading work on the land, knew that the premises were frequented by children of tender years, and was chargeable with knowledge of the condition of the fire. *Held:* The fact that the child was not injured by grading machinery and equipment which attracted her to the premises does not preclude recovery, since defendant could have foreseen that some injury might result to children of tender years from the way and manner in which it burned brush and other debris on the land.

**5. Same—**

The evidence tended to show that a 3-year-old child, in the company of an adult and other children, had gone upon land being cleared and graded by defendant, that the child's mother went where they were to get the child from the premises, talked briefly with the adult, and started back toward her apartment calling the child to come home, and that the child, in returning, walked into a bed of ashes and was burned by live coals underneath the surface. *Held:* The presence of the mother does not preclude recovery, since the evidence does not indicate that the mother had any information or knowledge that would put her on notice that a bed of live coals lay under the apparently harmless bed of ashes.

**6. Same—Evidence held sufficient to overrule nonsuit in this action to recover for burns received by child when attracted to premises by grading operations.**

The evidence tended to show that defendant was engaged in clearing and grading operations on land near an apartment building, that defendant burned brush and other debris in the area, which it knew was frequented by large numbers of children in going to and from the apartment houses to watch defendant's trucks, bulldozers and other equipment in the grading work, that mothers of the children had urgently and repeatedly requested defendant to guard against the children having access to the property, that no action was taken in compliance with these requests until the morning of the injury, and were not effective at the time, and that a 3-year-old child, while returning home in compliance with the command of her mother, was burned by live coals when she walked into a bed of apparently harmless ashes. *Held:* Defendant was responsible for the condition of the fire, and injury to children of tender years could have been reasonably foreseen therefrom, and therefore defendant's motion to nonsuit was properly denied.

**7. Evidence § 46g—**

In this action to recover for burns received by a 3-year-old child, evidence was admitted that prior to the injury the child was not nervous and that she slept and ate well, but that after the injury she was excitable, afraid of noises, and neither ate nor slept well. *Held:* Medical expert testimony to the effect that the injury could cause traumatic neuroses or personality shock to the child was properly admitted.

**8. Same—**

The fact that expert witnesses testify that an injury might or might not result in traumatic neuroses, goes to the weight of their testimony rather than to its admissibility.

**9. Trial § 31e: Appeal and Error § 39f—Charge construed as a whole held not to contain expression of opinion that defendant was negligent.**

The fact that the court, in dealing with definitions and requisites necessary in establishing negligence, states that "the fact that the defendant had been guilty of negligence" . . . would not render the defendant liable unless the negligence was the proximate cause of the injury, instead of an instruction that the fact that a defendant may have been guilty of negligence, etc., *held* not prejudicial when in other portions of the charge the court clearly instructed the jury that the burden was on plaintiff to estab-

lish negligence of defendant by the greater weight of evidence, and the *lapsus linguae* could not have misled the jury, construing the charge as a whole.

APPEAL by defendant from *Patton, Special Judge,* October Term, 1954, of MECKLENBURG.

This is an action instituted by Veda Ford, by her next friend, Harolee Ford, her father, to recover for injuries allegedly sustained by the plaintiff, a child three years of age, when on 25 July, 1952, she received second and third degree burns to her hands and feet as a result of stepping into a latent bed of hot ashes on the property of the P & N Railway Company, on which the defendant was carrying on a clearing and grading operation. The property which was being improved by the defendant was immediately adjacent to a housing development in which the plaintiff lived.

The defendant entered into a contract with the P & N Railway Company to clear and grade approximately 19 acres of land lying on each side of Thrift Road. The P & N property extended several hundred feet from a branch, up a hillside to within nine feet of the service drive to the rear of the nearest apartment building in the housing development, which building is located only 34 feet from the P & N property.

At the time the plaintiff was burned, there was no visible line between the playground area provided for the children who lived in the housing development and the P & N property. Some fifteen or twenty children lived in the eleven apartments located near the property. They were accustomed to play in the general area, including the area where the plaintiff was burned.

The defendant's grading project called for excavating the hill near the apartment buildings to the extent that the embankment created thereby was at some points approximately fifty feet high. According to the plaintiff's evidence, sometimes as many as twenty or possibly twenty-five machines, dump trucks, bulldozers and digging machines were used in the excavating operation. The equipment, when in operation, made a lot of noise. The father of plaintiff testified that the work started around 7:00 o'clock in the morning, and "you'd definitely have to get up. You couldn't sleep." This excavating operation could be seen from the apartment premises and the children were attracted by the noise of the machinery and went on the P & N property to watch the grading operation.

The work on the project started around 1 June, 1952, and as the excavating approached near the apartment houses, the mothers tried to keep their children off the premises, but without success. Finally, Mrs. William Shymanski, who lived with her two children in one of the apartments, had a conference with the defendant's superintendent who was in

charge of the project. This interview took place during the first week in July, and the work at that time was so close to the apartments and the playground, the mothers were all concerned about the drop, which was then about thirty feet, and the debris in the area where the children played. The superintendent was requested to build a fence between the P & N property and the apartment house area so as to protect the children, but nothing was done. He was again contacted about a week later, at which time he said, "they weren't going to go to the expense of putting up a fence." In clearing the land to be excavated, this witness testified, the defendant burned a lot of logs and stumps on the unexcavated area of the land.

Mrs. Claudine Ford, mother of the plaintiff, testified that on the afternoon of 25 July, 1952, around 2:30 or 3:00 o'clock, Veda was playing with other children; that she went out to check on her; that she called her and she didn't answer. That she was not concerned over the fires but concerned over the bank; that she had punished the child on one occasion for disobeying her instructions and going on the P & N property; that she had forbidden her to play down there; that she found her with a Mr. McDaniel and his children, watching the machines that were in operation on a lower level; that Mr. McDaniel did not ask her if her little girl could go along with them. "I knew he was there with the children and I knew Veda was playing . . . and would probably be with them because the children play around the playground in that area." That she went down where they were and said a few words to Mr. McDaniel, but did not sit down; she started back toward the apartment and called her child to come on home. The child did not have on shoes, and in returning she walked into the bed of ashes which were the same color as the land and located about 24 feet north of the apartment house property. "Of course you could tell where the stumps and leaves and all had been burned." The child received second and third degree burns and has bad permanent scars on her feet and legs. According to the testimony of the mother, the child was not nervous before the accident; she ate and slept well, but has been excitable and nervous since the accident and neither eats nor sleeps well. She is afraid of noise and is very restless.

Charles B. Wurtenberger, the defendant's superintendent, testified that, "When the machines were working in the area some distance from the apartment houses, small children from the area came on the property. . . . I saw the little girl when she went on the P & N property. She was accompanied by an adult man and three other children. . . . The man and the children went over to the edge of the bank and sat down . . . . A few moments later, I'll say three or four minutes later, a lady, whom I now recognize as Mrs. Ford, came . . . sort of running

. . . and went on down to the bank and sat down. She stayed . . . possibly five or six minutes. The next thing I knew, Mrs. Ford came running back out carrying the baby . . . ." This witness further testified that Mrs. Shymanski talked to him about the children being on the property. "Someone else beside Mrs. Shymanski talked with me about doing something about the children going down there to watch the operation, . . . It got so that every time I got up the top of the hill some of the women were after me to request that something be done. I did not see the little child when she stepped into the ash bed. The ash bed was about 15 feet behind the bank . . . which I would say would make it close to 30 feet inside the property line. . . . The defendant, Blythe Brothers, through my instructions, started the construction of a fence near the property line the morning of July 25th, the day of the accident. . . . There were fires being built there on the P & N property by me and my men. Children had been in and about the general area of the job on occasions before July 25th. . . . I said the children came out on the property. They came out frequently. They came in groups of three and four. . . . I mean kids eight, nine, ten years old. . . . Any time that we were able to get to them to tell them to get off the property, we told them to. . . . I had seen small children in the area where this particular fire was on occasions prior to that time, in the general area. I knew that . . . fire was built on July 24, 1952. I didn't have anybody there attending it the morning of July 25th. I think we had moved off to work in another area that day. It was built and I knew about it, and it was under my supervision."

C. M. Colvin, the defendant's foreman on the P & N job, testified that "When we were working in excess of one hundred feet or more from the line between the P & N property and the apartment house property, children came on the land very frequently, and we'd ask them to get off and they were very nice about it, they'd always run back, but they'd come back after we got on down further. . . . They looked like they run from about three to six or seven or eight years old. . . . On the day prior to the time the child was burned, we quit working at 5:30. . . . At that time the fire had burned down there, there was no smoke, we had rounded up and pulled away all the dry stuff from around it. I left a man out there in charge of the fire at that time. He was an old colored man that lived out in the Hoskins neighborhood. He's died since then. . . . I got on the job the morning of the day the accident happened at 6:30. The fire at that time was just like I left it. I couldn't tell there was any fire in it. . . . I don't remember particularly checking this fire. I didn't use any water or anything to put out the fires at night. . . . We never put any brush on them after three or four o'clock in the afternoon. . . . There's quite a lot of decomposed limbs, and some that were

not decomposed, and fat wood with tar in it, all around there, but we always clean it off before we leave a fire. Clean it off and burn it in the fire, clean off an area around it. We burn the trash and small limbs and haul the logs and stumps off."

According to the record, the fire department of the City of Charlotte was called to extinguish a fire that broke out on the premises of the P & N around 7:55 p.m. on 24 July, 1952, where the defendant had been burning "trash and rubbish." This fire, however, was not located at the place where the plaintiff was burned but a very short distance from it. The captain in charge of the crew that answered the call testified: "As far as we know, the fire was out when we left, but that stuff for days and days may smolder under there."

It was stipulated by the parties to this action that the father of the minor plaintiff Veda Ford, to-wit: Harolee Ford, who is the next friend of the minor plaintiff, waived his cause of action as to medical and hospital expenses in connection with the alleged accident, as well as any loss in earning capacity between the date of the accident and the time the minor plaintiff would become 21 years of age; and all parties agreed that the cause might be considered in the same manner as if the plaintiff were an adult.

From verdict and judgment in favor of the plaintiff, defendant appeals, assigning error.

*Henry L. Strickland and Wm. H. Booe, for appellee.*
*Kennedy, Kennedy & Hickman, for appellant.*

DENNY, J. The appellant does not bring forward in its brief and discuss or cite any authority in support of these assignments of error: Nos. 1 through 10, 16, 25, 29 and 30. Therefore, each one of them will be deemed abandoned. Rule 28, Rules of Practice in the Supreme Court, 221 N.C. 544.

Assignment of error No. 17, based on an exception to the refusal of the court below to sustain its motion for judgment as of nonsuit, interposed at the close of plaintiff's evidence and renewed at the close of all the evidence, presents the crucial question involved in this appeal.

The evidence clearly establishes the fact that the defendant knew that its clearing and excavating operation was attracting children in large numbers to the premises under its control; that its agents and servants knew of the frequent presence of children on the premises and on several occasions requested them to leave. The defendant's evidence also reveals that the children always left when requested to do so, but would return as soon as the person making the request left. The evidence likewise tends to show that the defendant's employees built fires

and burned brush and other debris in the area where they knew the children were accustomed to play or cross in going to and from the apartment houses to a vantage point on the hillside, to watch defendant's trucks, bulldozers, scrapers, crane, and other equipment move to and fro on a level far below them. It would be difficult to conceive of anything short of a circus that would be more likely to attract children to premises than the conditions which existed on the premises controlled by the defendant for the period of six or seven weeks immediately prior to the time the plaintiff sustained her injuries. Even so, in the face of urgent pleas by mothers of children who lived in the nearby apartment houses, to build a fence between the P & N property and the apartment houses, or to otherwise guard against the children having access to the property while the clearing and grading operation was in progress, no action was taken in compliance with these requests until the morning of 25 July, 1952, when the defendant started to build a fence along the line of the P & N property. However, the fence had not been erected between the apartment house area and the P & N property when the plaintiff sustained her injuries.

In *Briscoe v. Lighting & Power Co.,* 148 N.C. 396, 62 S.E. 600, 19 L.R.A. (NS) 1116, the plaintiff was not permitted to recover because the evidence failed to show that the premises of the defendant were especially attractive to children, or that children were accustomed to play there, but *Connor, J.,* in speaking for the Court, said: "We think that the law is sustained upon the theory that the infant who enters upon premises, having no legal right to do so, either by permission, invitation or license or relation to the premises or its owner, is as essentially a trespasser as an adult; but if, to gratify a childish curiosity, or in obedience to a childish propensity excited by the character of the structure or other conditions, he goes thereon and is injured by the failure of the owner to properly guard or cover the dangerous conditions which he has created, he is liable for such injuries, provided the facts are such as to impose the duty of anticipation or prevision; that is, whether under all of the circumstances he should have contemplated that children would be attracted or allured to go upon his premises and sustain injury. The principle is well stated in 21 A. & E., 473, and was cited with approval in *McGhee's case, supra* (147 N.C. 142). 'A party's liability to trespassers depends upon the former's contemplation of the likelihood of their presence on the premises and the probability of injuries from contact with conditions existing thereon.' Immediately following this language the editor says: 'The doctrine that the owner of premises may be liable in negligence to trespassers whose presence on the premises was either known or might reasonably have been anticipated is well applied in the rule of numerous cases, that one who maintains

dangerous implements or appliances on uninclosed premises of a nature likely to attract children in play, or permits dangerous conditions to exist thereon is liable to a child who is so injured, though a trespasser at the time when the injuries are received; and, with stronger reason, when the presence of a child trespasser is actually known to a party or when such presence would have been known had reasonable care been exercised.'" See also *Ferrell v. Cotton Mills*, 157 N.C. 528, 73 S.E. 142, 37 L.R.A. (NS) 64, in which this Court quoted with approval from 2 Shearman & Redfield on Negligence (4th Ed.), section 705, page 586, the following: "The owner of land where children are allowed or accustomed to play, particularly if it is unfenced, must use ordinary care to keep it in a safe condition; for they, being without judgment and likely to be drawn by childish curiosity into places of danger, are not to be classed with trespassers, idlers and mere licensees."

The defendant contends the operation carried on by it did not constitute an attractive nuisance and that the law with respect thereto is not applicable, citing *Briscoe v. Lighting & Power Co., supra; Boyd v. R. R.*, 207 N.C. 390, 177 S.E. 1; *Reid v. Sustar*, 208 N.C. 203, 179 S.E. 659; *Harris v. R. R.*, 220 N.C. 698, 18 S.E. 2d 204; *Hedgepath v. Durham*, 223 N.C. 822, 28 S.E. 2d 503; *Boyette v. R. R.*, 227 N.C. 406, 42 S.E. 2d 462; *Nichols v. R. R.*, 228 N.C. 222, 44 S.E. 2d 879, and similar cases. Certainly we are unwilling to hold that a clearing and grading operation such as that in which the defendant was engaged when the plaintiff was injured, constituted an attractive nuisance *per se*, but, on the other hand, it is not necessary that a thing or operation be an attractive nuisance in order for it to allure or attract children. For example, we have held in numerous cases that ponds, lakes, streams, reservoirs, and other bodies of water do not *per se* constitute attractive nuisances. *Stribbling v. Lamm*, 239 N.C. 529, 80 S.E. 2d 270; *Fitch v. Selwyn Village*, 234 N.C. 632, 68 S.E. 2d 255; *Nichols v. R. R., supra; Barlow v. Gurney*, 224 N.C. 223, 29 S.E. 2d 681; *Hedgepath v. Durham, supra*. But, *Barnhill, J.*, now Chief Justice, in speaking for the Court in *Barlow v. Gurney, supra*, in holding that it is not negligence for a person to maintain an unenclosed pond or pool on his premises, pointed out that "When, however, he exercises this right and children of tender years are attracted thereto and it becomes a common resort of persons of tender years to which they go to play, and it appears that the owner knows or by the exercise of ordinary care should know that it is being so used, then it becomes his duty to exercise ordinary care to provide reasonably adequate protection against injury. Failure so to do constitutes an act of negligence. Proximate cause is for the jury," citing numerous authorities.

The defendant further contends that if the plaintiff was attracted to its premises by the operation of its machinery and other equipment, as alleged, she is not entitled to recover since she was not injured by the machinery and equipment which attracted her. We cannot agree with this contention.

In *Comer v. Winston-Salem,* 178 N.C. 383, 100 S.E. 619, a child, twenty-eight months old, was killed by falling from a bridge with insufficient guardrails. The bridge had been constructed across a large branch. A culvert was constructed underneath the bridge through which the branch flowed. As the water ran out of the culvert, over an extension of its base, it rushed out with considerable force, making such noise that people passing over the bridge could hear the rushing of the water. Owing to the dyes poured into the stream from the mills above the bridge, the water was at times of many colors. While the rippling of the water could be heard by the children on the bridge, the water could only be seen by them by leaning over the bannister or railing, or getting through it. The culvert was located about 200 feet from the child's home and was near a number of houses in the community, it being a residential and thickly settled section, adjoining the playground where the children of the neighborhood were accustomed to gather. The court below overruled the motion for judgment as of nonsuit and submitted the case to the jury. From a verdict in favor of the plaintiff, the defendant appealed to the Supreme Court. *Clark, C. J.,* in writing the opinion disposing of the appeal, said: "The plaintiff did not claim that the bridge was defective, but relied upon the fact that the authorities knew that the rippling of the water and its many-hued colors attracted the children, and that for twenty years the locality adjacent had been a playground for them, and with knowledge of the natural curiosity of children in such cases, more sufficient protection should have been placed at that point. . . . This is not even the case of an 'attractive nuisance' on the property of another, which would render that other liable if not sufficiently protected. A silent turntable on the property of a railroad would not attract the attention of children as irresistibly as their irrepressible curiosity would tempt them to investigate the cause of the gurgling of the many-hued water, which rushed from under the bridge 20 feet below the point at which they would attempt to see it. The bridge was not an attractive nuisance. It was not a nuisance at all. It was a necessary structure for the use of the city. But the noise made by the gurgling of the water would move children to wish to investigate the cause. . . . The negligence was not in the grade of the street, nor in the bridge or culvert, but in the want of sufficient protection for the children of the neighborhood frequenting that spot."

Likewise, in *Arrington v. Pinetops*, 197 N.C. 433, 149 S.E. 549, one Louis Morgan, father of Mamie Morgan, rented certain lands from John R. Pitt in Edgecombe on which to make a crop for the year 1926. The edge of Morgan's cotton field was only eleven steps from a power line owned by the Town of Pinetops. Sometime prior to the time Mamie Morgan was killed, the Hookerton Terminal Company, in excavating sand and gravel, had undermined one pole of the transmission line, leaving the wires thereon from five to seven feet above the ground, on top of an embankment. Mamie Morgan, a child nearly thirteen years old, and her half sister went into the woods adjoining the field of their father. Coming back from the woods to their work in the field, they stopped and were looking at the sand digger; it was not working. The half sister started on to the field when she heard a roaring. Mamie had her hand on the high voltage wire and was killed. From a verdict in favor of plaintiff, establishing primary liability against the Hookerton Terminal Company, and secondary liability against the Town of Pinetops, both defendants appealed. The Hookerton Terminal Company insisted that the little girl was a trespasser upon its property and that her administrator should not be allowed to recover. *Brogden, J.,* said: ". . . the defendant, Hookerton Terminal Company, was charged with notice that these children were working in the field only eleven steps away, and that they had a right to use the woods for any lawful purpose. While there was no pathway or walkway at the place where the pole was excavated, still these children, doubtless attracted by the machinery and sand pit, could not be reasonably held as trespassers in a legal sense because they came up to the bank out of curiosity and peeped over into the sand pit."

In our opinion, it was within the reasonable prevision of the defendant to have foreseen that some injury might result from burning brush and other debris in the way and manner it did within the area it knew was frequented by children of tender years. Neither do we think the presence of the mother who came for and called her child, or the presence of McDaniel and his children, in any way relieved the defendant of its duty to keep the premises safe in the light of its knowledge of the frequent presence of children. There is nothing in the evidence to indicate that the mother of this plaintiff had any information or knowledge that would put her on notice that a bed of coals lay under the apparently harmless bed of ashes, while the defendant's agents and servants knew that a fire had been burning there all day, the day before the accident. They also knew the type and character of trash and debris that had been burned there, but made no effort to see that the fire was put out. Furthermore, there is no question about the ash bed containing live coals beneath the surface, a condition for which the defendant was

responsible and which we think it might reasonably have foreseen was likely to cause an injury to a child of tender years, should it walk or run through it.

Therefore, in our opinion, the court's ruling on the defendant's motion for judgment as of nonsuit was correct.

Assignments of error Nos. 11, 12, 13, 14 and 15 are based on exceptions to the admission of expert testimony by Dr. William H. Shaia, who treated the plaintiff at the time of her injury, and that of Dr. George D. Page, who examined her on 21 May, 1954, as to whether or not such injuries as those sustained by the plaintiff could cause any traumatic neurosis or personality shock to her. Both experts expressed the opinion that they could. We think the testimony of these experts, to which the defendant objected, was admissible, particularly in view of other testimony offered by the plaintiff, without objection, to the effect that plaintiff was not a nervous child before her injury; that she ate and slept well, but since the accident she is excitable, nervous, afraid of noises, and neither eats nor sleeps well. The fact that these expert witnesses further testified that the experience encountered by the plaintiff in connection with her injuries might or might not result in traumatic neurosis or personality shock to her, goes to the weight of their testimony rather than to its admissibility.

The defendant also excepts and assigns as error the following excerpt from the court's charge to the jury: "The fact that the defendant has been guilty of negligence, followed by an injury, does not make such defendant liable for that injury which is sought to be referred to the negligence unless the connection of cause and effect is established, and the negligent act of the defendant must not only be the cause, but the proximate cause, that is the producing cause of the injury complained of."

We concede that it would have been more appropriate if his Honor had said: The fact that *a* defendant has been guilty of negligence, etc., or, the fact that a defendant *may have been* guilty of negligence, etc. However, in this portion of the charge the court was dealing with definitions and the requisites necessary to establish actionable negligence. Moreover, when the court came to charge the jury on the issue of negligence, it clearly put the burden on the plaintiff to establish the negligence of the defendant by the greater weight of the evidence. This *lapsus linguœ* on the part of his Honor, in our opinion, was not prejudicial to the defendant when the charge is considered as a whole. Hence, this assignment of error is overruled.

We have carefully examined the remaining assignments of error and, in our opinion, they present no harmful or prejudicial error that would justify us in disturbing the result of the trial below.

In the trial below we find no error.

No error.