LILLIAN A. DEAN, ADMINISTRATRIX OF JAMES HYLTON v. WILSON CONSTRUCTION COMPANY, A CORPORATION.

(Filed 14 January 1960)

**1. Negligence § 39—**

A fourteen-year old boy who enters upon a road construction site and opens a sliding door to the cab of a large crane used in excavation work, and undertakes to operate the crane, is a trespasser, certainly when he had theretofore been warned by a neighbor to keep off the machinery.

**2. Same—**

The duty owed by the owner or occupant of land to trespassers is not to wilfully or wantonly injure them.

**3. Negligence § 36—**

In order to invoke the doctrine of attractive nuisance plaintiff must introduce evidence to support the finding that the defendant knew, or in the exercise of reasonable care should have foreseen, that children were likely to play upon the dangerous instrumentality.

**4. Same—**

The doctrine of attractive nuisance is usually applied to very young children, who because of their youth, do not realize the risk involved. The doctrine does not apply to a fourteen-year old boy of more than average intelligence who enters upon a construction site and deliberately opens the sliding door to a large crane, starts the motor and undertakes to operate the boom.

**5. Same—**

Evidence that a fourteen-year old boy entered upon a construction site, opened the sliding door to the cab of a large crane, started the motor, and, in undertaking to operate the crane, caused the boom to come in contact with high-tension wires resulting in his death, together with testimony of an experienced workman that in ten years he had never known a person other than a trained operator to attempt the operation of a crane, *is held* insufficient to be submitted to the jury on the issue of the negligence of the construction company in leaving the machinery unlocked and unattended after working hours.

**6. Same—**

The act of a fourteen-year old boy, of more than average intelligence, in entering upon a construction site and opening the sliding door to the cab of a crane, starting the motor of the crane, and undertaking to operate the same, *is held* to disclose contributory negligence on his part barring recovery for his death when the boom of the crane operated by him struck a high-tension wire.

APPEAL by plaintiff from *Fountain, Special J.,* (first) June Assigned Term, 1959, of WAKE.

Civil action to recover damages for the death of James Hylton, plaintiff's intestate, allegedly caused by the negligence of defendant.

James Hylton, aged fourteen on May 8, 1957, died about 6:00 p.m. on August 1, 1957. After the workmen had left the job, he went into a construction area and got into and operated defendant's crane. The boom struck high-tension transmission lines, electrifying the boom and the crane; and, in attempting to get from the cab of the crane, part of his body came in contact with the metal of the crane, causing instant death by electrocution.

The crane was mounted on caterpillar tracks. It had a steel cab; and a steel boom, about 35 feet long, extended directly to the front of the cab. The cab and boom pivoted simultaneously when material picked up in one place in the bucket or scoop was moved around for deposit elsewhere. Inside the cab, "there were a number of levers, gears and foot pedals which were used to operate the crane, including the raising and lowering of its boom, the use of the large steel bucket attached to the boom, and the movement of the crane."

Plaintiff alleged: "15. That said crane and its operating mechanisms were attractive to children and particularly to young boys between the ages of 11 and 14 years, and for several days prior to August 1, 1957, it had been the practice of young boys residing in the neighborhood where said work was in progress to play on and about said crane and other machinery and equipment which defendant was employing on said construction job both during and after working hours; and that these facts were well known to the defendant and its various employees who were engaged in the work on said job."

Plaintiff alleged that defendant was negligent in these respects: (1) It "failed and neglected to secure the ignition system on the crane engine." (2) It "failed and neglected to lock the cab door." (3) It "failed and neglected to place any warning signs in and about said equipment to warn of its inherently dangerous nature." (4) It "failed and neglected to warn plaintiff's intestate and other children playing in the neighborhood and to forbid them from playing on said equipment." (5) It knew, or in the exercise of reasonable care should

have foreseen, that children playing in and about defendant's said machinery and equipment would likely suffer death or serious bodily harm. Such negligence on the part of defendant, plaintiff alleged, proximately caused her intestate's death.

To support her allegations, plaintiff (the intestate's mother) offered evidence tending to show the facts narrated below.

Incident to the widening and paving of Dixie Trail, a public street, defendant, pursuant to its contract with the City of Raleigh, was engaged in the construction of a culvert at Beaver Dam Creek. Dixie Trail runs (generally) north and south. It had been closed (by barricades) for defendant's operations. The crane was in Dixie Trail, just south of the "very large size culvert ditch."

Grant Avenue, an east-west street, dead-ends at Dixie Trail. A barricade on Grant Avenue faced westbound traffic thereon. The barricade marking the south boundary of defendant's operations ran across Dixie Trail "just about at the point where Grant Avenue entered Dixie Trail." It was approximately 125 feet from (north) this barricade to the creek.

Wade Avenue is the next east-west street south of Grant Avenue. The portion of Dixie Trail between Wade Avenue and the area of defendant's operations had been "blocked off" for grading work. Heavy machines, including at least one bulldozer, were in this area.

Residences were along Grant Avenue. Going north on Dixie Trail from Wade Avenue to Beaver Dam Creek, the (left) west side of Dixie Trail was an undeveloped wooded area. There were residences on the (right) east side of Dixie Trail. James Hylton lived (with his mother, Mrs. Donald M. Dean, and her husband) at the southeast corner of Dixie Trail and Grant Avenue. The Roberts residence, facing on Grant Avenue, was at the northeast corner of Dixie Trail and Grant Avenue. The Roberts property extended north to Beaver Dam Creek. The area of defendant's operations extended along the side of the Roberts property. The barricades were across the respective streets.

Between Grant Avenue and Beaver Dam Creek, high-tension power lines ran approximately parallel to, and some fifteen feet east of, the east edge of the pavement on Dixie Trail. On both sides, "the ground was considerably lower than the roadbed of Dixie Trail."

There were no signs warning persons to keep away from the equipment. Defendant's foreman, upon adverse examination, recalled no occasion when children or others were warned to get farther away from the equipment or to leave.

Defendant's construction operations had been in progress for a week or more. Paul M. Yount, defendant's foreman, was in charge of con-

struction. He gave orders to T. J. Medlin, defendant's crane operator, as to the work to be done by the crane. Only a regular crane operator was permitted to operate the crane.

Shortly after 3:00 p.m. on the afternoon of August 1, 1957, Medlin completed his work for the day and left the job. Defendant's other employees, including Yount, left "around 5:30 p.m." Thereafter, "no employees of defendant remained on the job site in charge of said crane or any other equipment."

There was a sliding door on the right front side of the cab of the crane. When Medlin (who died prior to the trial) quit work on August 1, 1957, he closed the door by sliding it forward but did not lock it. There was a latch at the front, available for attaching a lock, but there was no lock on this latch. The boom was pointed in a general westerly direction, that is, away from the power lines, and was some feet above the ground. The bucket was lying on the ground. Behind the crane, within defendant's area of operations, were piles of dirt which had been brought out of the creek, one probably as high as twelve feet.

Shortly after defendant's employees had left the job, plaintiff's witnesses Phillip Strobel and George Boder, both aged fourteen, and James Hylton, who had been playing badminton in Boder's backyard, quit their game, at Hylton's suggestion, and went to the construction area. Strobel testified: ". . . James said he would like to go down and look at the machinery." Boder testified: ". . . James stated to me that he wanted to play on the bulldozers."

Upon reaching Dixie Trail, they went first to a bulldozer that was in front of Mrs. Perry's house, "about three houses south of the Dean house." Hylton got up on the bulldozer and started it. Just then Mrs. Perry came out of her house, told the boys to leave and warned them to stay off of the equipment. Hylton then suggested that they go north, into the area of defendant's operations, that "he wanted to look at the crane." The crane was about 200 feet from (north) the bulldozer in front of Mrs. Perry's house. The boom and cab of the crane then faced west. The bucket was on the ground, some 10-15 feet from the crane. The boom was up in the air, at an angle of approximately 55 degrees.

Strobel and Boder, passing the crane, went to and crossed the creek. They were throwing dirt clods into the water when other boys chased them back to the south side of the creek. Meanwhile, Hylton had gone to the crane. Boder, who returned first to the side of the crane, saw Hylton slide open and enter the door to the cab. Hylton then got the engine started but cut it off and got out of the cab. Upon Strobel's return to the site of the crane, Hylton told him what he

had done. Hylton told Boder that "he wanted to take the boom around so he could drop the bucket in that ditch on the east side of Dixie Trail."

Hylton then got back into the cab and sat in the operator's seat on the right side of the cab. Strobel also got into the cab and stood "on the little ledge next to the driver's seat." Boder walked around and sat on a little ledge on the back of the crane but left and got on a mound of dirt some two or three feet back (south) of the crane when Hylton started the engine.

Hylton again started the engine, by pushing a button. Strobel's testimony as to what then occurred (substantially in accord with the testimony of Boder) was as follows:

"While I was standing there in the edge of the crane, I saw James operate it, that is, work the crane back and forth for several minutes. He first swung the crane from side to side, sort of testing out which lever worked which part of the crane. He didn't also work the boom up and down. I could see him lift the bucket up off the ground. When I first came there, the steel bucket was sitting on the ground. When I first came there the boom of this crane was pointed west across Dixie Trail. At the time the boom of the crane ended up in these high-tension wires it was then pointed just about east. In other words, at that time it had swung all the way around and almost a 90-degree angle. I remember hearing James say something about he was going to swing that boom around and drop the bucket in the ditch on the east side of Dixie Trail. After he said that, I saw him work the levers and the crane began to turn, that is the cab of the crane began to turn to its right, that is toward the east of Dixie Trail. The crane was moving at a sort of even slow pace. Then as the crane swung almost all the way around to my right, that is to the east, the top of it suddenly hit into these electric wires on the east side of Dixie Trail. I don't remember exactly if at that time the bucket of the boom was almost over that ditch on the east side of the road to which James wanted to put the bucket into. I think it had just about gotten over there."

When the boom hit the wires there was a big "bang." The sparks began to fly at the points of contact; and there were sparks and a small amount of flame coming from the caterpillar tracks where the crane was grounded. Strobel jumped from the cab, clearing the metal of the crane, hit the ground and ran. Neither Strobel nor Boder was injured.

A police officer, in response to a report that children were playing on the construction equipment, was en route to the scene; but the

tragedy had occurred before he arrived. Upon arrival, he called the Power Company and the Fire Department. Soon the power was cut off. A crane operator came and removed the boom from the power lines. When the officer could safely go to the crane, he found Hylton's dead body, his legs near one of the tracks of the crane.

No witness had seen Hylton attempt to get from the cab. When Strobel, fleeing from the crane, last saw him, Hylton "was sitting there . . . trying to move the crane from the wires or something."

Reference will be made in the opinion to other facts disclosed by the evidence.

At the close of plaintiff's evidence, the court entered judgment of involuntary nonsuit. Plaintiff excepted and appealed.

*Dupree & Weaver and David R. Cockman for plaintiff, appellant.*
*Smith, Leach, Anderson & Dorsett for defendant, appellee.*

BOBBITT, J. The evidence does not support the allegations in plaintiff's paragraph 15, quoted in the statement of facts. The evidence relating to these allegations tends to show: At times, when the work was in progress, onlookers, including small children, stood at the barricades and watched the operation of the machinery. At times, older boys watched from closer positions. Hylton, Strobel and Boder had watched from a bank on the Roberts property. Boder testified they "went off the bank and went around right where they were working." Strobel testified that at such time he got "within about 30 feet of it . . ." Mrs Dean testified that, "after working hours every afternoon," she had observed small children and persons of all ages "at or about this equipment." *There was no evidence that any person either during or after working hours had undertaken to get upon and to intermeddle in any way with any equipment in the construction area.*

It was "still daylight" when the fatal accident occurred. The three fourteen-year old neighborhood boys could observe and were fully aware of the existing physical conditions, including the location of the power lines.

We are not concerned directly with Hylton's conduct in climbing upon and starting the bulldozer in the area south of the area of defendant's operations. However, if he was not already fully aware of his status as a trespasser and of the danger involved in his attempted operation of the bulldozer, Mrs. Perry's warning was sufficient to bring these facts to his attention. Disregarding Mrs. Perry's warning, he proceeded to the crane.

In opening the door and entering the cab of the crane, in his first

operation thereof, and in his later operation thereof for a specific purpose, all of Hylton's efforts were intentional and deliberate. They reflect a steady nerve, daring, alertness, intelligence and skill. In getting into and operating defendant's crane, Hylton was a trespasser and was well aware of that fact.

"As affecting liability for injury resulting from the condition of premises in private ownership or occupancy, one who enters without permission or other right is a trespasser." *Hood v. Coach Co.,* 249 N.C. 534, 107 S.E. 2d 154. "The duty owed to trespassers is that they must not be wilfully or wantonly injured." *Jessup v. R. R.,* 244 N.C. 242, 93 S.E. 2d 84; 65 C.J.S., Negligence § 24; 38 Am. Jur., Negligence § 110.

There being no evidence that Hylton's death was caused by the wilful or wanton negligence of defendant, plaintiff frankly bases her alleged right to recover on the so-called attractive nuisance doctrine, citing *Ford v. Blythe Brothers Co.,* 242 N.C. 347, 87 S.E. 2d 879, where *Denny, J.,* quotes (with approval) from *Judge Connor's* opinion in *Briscoe v. Lighting and Power Co.,* 148 N.C. 396, 62 S.E. 600, 19 L.R.A. (N.S.) 1116. See 1 N.C.L.R. 162, "Limitations of the Attractive Nuisance Doctrine," where the *Briscoe* case is discussed in detail, and *Campbell v. Laundry,* 190 N.C. 649, 130 S.E. 638, where *Varser, J.,* citing the *Briscoe* case, stated that this Court was not disposed to extend the so-called attractive nuisance doctrine.

In the *Briscoe* case, where demurrer was sustained, the plaintiff was a thirteen-year old boy. In the *Ford* and *Campbell* cases, recovery was allowed. In *Ford,* a three-year old girl stepped into a latent bed of hot ashes. In *Campbell,* a four-year old boy climbed upon an electric delivery truck, improperly parked, and pushed a lever and thereby set it in motion. The present case does not involve a deceptive condition or latent danger, nor does it involve an accidental setting in motion of machinery.

Full discussions of the origin of the so-called attractive nuisance doctrine and of the divergent decisions relating thereto are set forth in 65 C.J.S., Negligence § 29, and in 38 Am. Jur., Negligence § 142 *et seq.* North Carolina decisions relating thereto are cited and discussed in 13 N.C.L.R. 340 and in 26 N.C.L.R. 227.

There is a growing tendency to discard the phrase "attractive nuisance doctrine" as denoting an inflexible rule of law of precise meaning. Thus, in the Restatement of the Law of Torts, § 339, under the caption, "Artificial Conditions Highly Dangerous to Trespassing Children," the conditions under which "A possessor of land is subject to liability for bodily harm to young children trespassing thereon caused by a structure or other artificial condition which he maintains

upon the land," are set forth. The legal principles there stated have received widespread approval. Prosser on Torts, Second Edition, § 76, p. 440 et seq.; 65 C.J.S., Negligence § 28, p. 454.

Under our decisions, to invoke the attractive nuisance doctrine, it is essential that "the facts are such as to impose the duty of anticipation or prevision." *Briscoe v. Lighting and Power Co., supra.* In our view, the evidence is insufficient to support a finding that defendant knew, or in the exercise of reasonable care should have foreseen, that children or persons of any age were likely to open the door of the cab, climb into the operator's seat and undertake to operate the crane. Indeed, it would seem that Hylton's venturesome conduct far exceeded the limits of reasonable prevision.

Yount, during ten years experience, had never known a person other than a trained operator to attempt the operation of a crane. Mrs. Dean testified: "I had never known him (Hylton) to get on cranes or heavy machinery such as this before this day." Again: "I had not specifically warned him to stay off any of this equipment; I saw no necessity for doing that."

Moreover, the attractive nuisance doctrine is designed to protect "small children" or "children of tender age." 38 Am. Jur., Negligence § 157. It applies to children who, "because of their youth do not discover the condition or realize the risk involved in intermeddling in it or coming within the area made dangerous by it." Restatement of the Law of Torts, § 339(c). "It does not extend to those conditions the existence of which is obvious even to children and the risk of which is fully realized by them." Restatement of the Law of Torts, § 339, comment, p. 922.

"The attractive nuisance doctrine applies only in favor of children of tender years who are too young to understand and appreciate danger, and excludes those who have reached years of discretion and are able to understand and appreciate the danger or who, knowing the hazard, assume the risk of doing that which will imperil their lives or limbs, even though the owner has notice that children are accustomed to come about the place of danger.

"While there is no definite age fixed at which a child ceases to be entitled to the protection of the attractive nuisance doctrine, the great majority of cases in which it has been applied have involved children of less than ten years of age, and it has been considered that it cannot be applied to a child of the age of fourteen or over, at least in the absence of some showing of a lack of the mental development which is ordinarily found in children of that age or of a very exceptional state of facts." 65 C.J.S., Negligence § 29(11).

In *Briscoe v. Lighting and Power Co., supra, Connor, J.,* states:

"Again, in the numerous cases which we have examined we do not find any in which a boy of thirteen years, 'with the usual intelligence of boys of that age,' has been permitted to rely upon the attractive allurements of machinery to children."

James Hylton was a well-developed and healthy fourteen-year old boy. Mrs. Dean testified: "I felt that he did have quite a good mind. He had successfully completed the seventh grade at Josephus Daniels High School . . ." He was interested in outdoor sports, particularly baseball and fishing. Mrs. Dean testified: "And he was crazy about the Marines. He was interested in his church, Sunday school and scouting." Indeed, all the evidence leaves the impression that he possessed as much as or more than "the usual intelligence of boys of that age."

Much as we may admire James Hylton, and much as we may deplore his untimely death, the fact remains that the evidence shows unmistakably that (1) he knew he was a trespasser, (2) he was conscious of the danger, and (3) he deliberately risked the consequences of his wrongful conduct. Under these circumstances, we are of opinion, and so hold, that plaintiff may not, under the attractive nuisance doctrine or otherwise, recover from defendant for James Hylton's death.

If instead of causing his own death, Hylton, in operating the crane had caused injury or death to an innocent bystander, unquestionably such injury or death would have resulted from Hylton's actionable negligence. The evidence, taken in the light most favorable to plaintiff, discloses that her intestate's negligence was either the proximate cause, or in any event a contributing proximate cause, of his own death. *Tart v. R. R.*, 202 N.C. 52, 161 S.E. 720; *Van Dyke v. Atlantic Greyhound Corp.*, 218 N.C. 283, 10 S.E. 2d 727; *Luttrell v. Mineral Co.*, 220 N.C. 782, 18 S.E. 2d 412.

For the reasons stated, the judgment of involuntary nonsuit is affirmed.

Affirmed.