PAUL E. THACKER v. HURSHEL E. WARD, JR., AND WILLIAM C. MARK-HAM, JR., T/A WARD-MARKHAM CO., AND BILLY SANFORD McCOY.

(Filed 29 January, 1965.)

**1. Damages § 11—**

Where the complaint describes an injury which necessarily causes physical pain the law will presume some mental anguish, and such natural consequences need not be pleaded in detail, but plaintiff must set forth in his complaint allegations as to consequences which are not the natural or normal result of the injury, since the defendant is entitled to know from the complaint the nature of the injury to which he must answer in order to make his defense and not be taken by surprise at the trial.

**2. Same— Allegations of physical pain and mental anguish and shock to nervous system held insufficient predicate for recovery for traumatic neurosis.**

Plaintiff alleged that the accident in suit seriously and painfully injured his head, neck, back, chest and shoulders, that his nervous system was severely shocked and his ability to sleep impaired, and that he had suffered exhausting physical pain and mental anguish. Plaintiff's evidence tended to show, in addition to physical injury, a psychoneurotic reaction resulting in total disability, but plaintiff's expert testimony was to the effect that plaintiff's complaints were entirely without organic basis. *Held:* In the absence of allegation that plaintiff had become a victim of traumatic neurosis the court correctly instructed the jury that it might award damages for all physical incapacities, past, present, and future plus all physical and mental suffering which was the immediate and necessary consequence of the injury sustained, but that the jury should allow nothing for psychological complaints.

**3. Trial § 33—**

The court may not submit a case to the jury on a particular theory unless such theory is supported by both allegation and evidence.

APPEAL by plaintiff from *Hobgood, J.,* March 1964 Civil Session of WAKE.

Action for personal injuries. On April 25, 1960, plaintiff, a 41-year-old man employed by the Seaboard Airline Railroad Company as a switchman and yard conductor, was operating his automobile northerly on Boylan Avenue in the City of Raleigh. Intending to make a right turn onto Willard Place, a narrow street which forms a T intersection with Boylan, he stopped to permit a truck traveling west on Willard to clear the intersection. While waiting, he was struck from the rear by a truck owned by defendants Ward and Markham and operated by their employee, defendant McCoy. Plaintiff alleges that, as a result of this impact,

"(H)e was shocked, stunned, bruised and injured about various parts of his body; he was seriously, painfully and permanently injured about his head, neck, back, chest and shoulders; he suffered severe injuries to his cervical spine; the muscles, ligaments, nerves, tissues and bones of his neck were injured; the severe injury to his cervical spine necessitated the application of traction to his neck and the wearing of a cervical brace; he suffered and continues to suffer constant and intractable headaches; he was treated intensively with drugs and physical therapy; *his nervous system was severely shocked and damaged and his ability to sleep was and has been permanently impaired.* That as a direct result of said injuries, the interspaces between the vertebrae of his cervical spine have suffered a narrowing (cervical osteoarthritis), and the neuroforamina at all these levels of his cervical spine suffered a moderate encroachment. These painful, serious and permanent injuries have required that he receive out-patient hospitalization and will require hospitalization and major surgery (cervical fusion), and orthopedic care and treatment in the future; that as a direct result of these specific injuries plaintiff *has suffered excruciating physical pain and mental anguish.* That at the time of his injury the plaintiff was gainfully employed as a yard conductor-switchman with the Seaboard Air Line Railroad Company, Raleigh, N. C., and was earning in excess of $5,000.00 a year; that as a direct result of the injuries received in the aforementioned collision, plaintiff has been rendered totally and permanently disabled, and unable to perform the duties of such employment, and the plaintiff has been damaged in the sum of Two Hundred Thousand Dollars ($200,-000.00)." (Italics ours).

Plaintiff's evidence tends to show the following: On March 14, 1960, he had passed the physical examination conducted by the Railroad's medical examiner; he was in good health on April 25, 1960. On that day, immediately after the collision, plaintiff felt numb and dazed, but he did not believe himself injured. He drove his car away from the scene and went ahead with his plans for the day. Thereafter, however, pain and stiffness, which became progressively worse, developed in his neck and back, and his head began to ache. Between April 25th and May 5th he was able to work only four days. Since May 5, 1960, he has been in constant pain and totally unable to perform his duties as a trainman. On December 29, 1960, on the basis of plaintiff's complaint to him, the Railroad's medical examiner declared plaintiff unfit for further employment by the Railroad.

On May 3, 1960, plaintiff consulted Dr. A. E. Harer, an orthopedic surgeon, who diagnosed his condition as a sprain of the cervical and lumbo-sacral spine. Dr. Harer treated him with traction, physiotherapy, and medications. By August 1960 plaintiff had developed a deformity which resulted from continuously carrying his head in a forward position, "flexed as though he could not hold his head up straight." Dr. Harer then referred plaintiff to Dr. R. W. Willett, an internist, who gained the impression that the anteflexed position of plaintiff's neck was due to *voluntary* guarding. He found his coördination to be normal and diagnosed plaintiff's case as "anxiety with tension headaches, hypochondriasis."

At intervals plaintiff consulted other specialists with reference to his injury: orthopedists at Duke Hospital in May 1960, at the veterans hospitals at Durham and Winston-Salem (7 trips from February 1961 to December 1963), and at Johns Hopkins Hospital in February 1962 and December 1963; an internist in September 1960; a neurologist in October 1960; an opthalmologist in the early part of 1962; an arthritis specialist in December 1963; and a chiropractor (time unknown). At no time did he ever stay overnight in a hospital. At the time of the trial his medical bills totaled $1,144.00.

Hereafter, chronology becomes difficult. After seeing Dr. Harer, plaintiff began to keep a diary of "where he ached and hurt from time to time." According to plaintiff, he became "absolutely stiff and rigid." He is still stiff and cannot bend over at all. He developed dizziness, strange sensations in his head and neck, a "filibrating heart," and difficulty in breathing. His ability to sleep was and is impaired; his arm movements became restricted, and he is now afflicted with "fumblingness." In August 1960 he felt "like he was up on a hinge," his shoulders "sitting up from the rest of his body." He "got to having a blue flash going through his head; somewhere along in there it felt like electrical waves were going through his hair when he combed or touched it." There was a numbness in the hair on his head. He had the sensation of "dropping and swishing in his brain." He lost his Adam's apple. His throat "felt like there was a circle or a string around it at an oblique angle — high on the right side and low on the left." After his throat went back into place "on Mother's Day," his spine began to feel as if it were enclosed in a pipe. He felt as if he had "pancakes and fishtails" in his back. Electrical impulses ran up and down his spine for months and created "a sensation as though an electric motor were generating waves in the lower spine, these working up his back, moving about three quarters of an inch per second. . . ." When these waves would get ahead on one side, there was "a terrible mixup." From time to time, however, these impulses would travel from one part of his body

to another, and queer sensations compassed him about. A pear-shaped lump with no end developed on his neck and remains there. For three years his eyeballs were painful and sore inside. In June 1960 his eyes were jumping back and forth about two inches "like a printing press." When in the early part of 1962 he began to fear blindness from the accident, he consulted an opthalmologist. He prescribed glasses, which plaintiff did not purchase, and the eye symptoms eventually disappeared. He still has pains in his head and cheeks. Seven or eight times he lost his voice; twenty-five to thirty times his voice became "a high thrilly type." In the summertime he has swelling of the feet and sensations of tight bands constricting his feet, with stringing sensations up his legs. A numbness began around his buttocks and spread into both legs. He lost all feeling in his right leg.

Because he was unable to work and wanted just "to have something to do to kill time," plaintiff began to attend the trial of personal-injury cases in the Superior Court. Having a pass on the Railroad, he traveled as much as he could in order to keep from being "charged with vagrancy." In 1961 and 1962 he spent a while at Miami Beach; in 1962 he spent the summer on the sand at Virginia Beach. Frequently he "would get on a train and ride somewhere else just spending a day and night" to save money.

Dr. Harer, as a witness for plaintiff, testified that plaintiff has a full range of motion in his entire spine, but that motion in the neck is guarded, "presumably because of pain." His reflexes are equal and active, and he has experienced no sensory changes. Neither Dr. Harer nor any other physician who examined plaintiff ever found any physiological or anatomical condition which could possibly form the basis for any of his complaints. Manual examination revealed no muscle spasm. Dr. Harer found no abnormal lumps in plaintiff's neck. X-rays were negative except that they revealed osteoarthritis, which predated April 25, 1960, in plaintiff's spine. It is Dr. Harer's opinion that although a sprain of the cervical spine could aggravate previously asymptomatic osteoarthritis, the symptoms of which plaintiff complained "actually did not affect his arthritis." It is Dr. Harer's opinion, also, based on plaintiff's complaints to him (subjective symptoms), that plaintiff now has a permanent injury.

Dr. Zadek of Johns Hopkins testified by deposition in December 1962 that, upon his examination of plaintiff, he found some limitation of plaintiff's cervical spine and "the gross defect of holding his head forward." He found "no objective pathology" to support plaintiff's complaints about his legs.

Dr. Leroy Allen, the neurosurgeon to whom Dr. Harer referred plaintiff, testified as a witness for defendants. In September 1960, when he

examined plaintiff, it was his opinion that if plaintiff would relax his neck muscles voluntarily, his cervical spine would be normal. He believed that plaintiff's complaints were all functional and entirely without organic basis, that is, that they were psychological.

The trial judge instructed the jury that it could award damages only for physical injuries, past, present, and future, plus "all physical and mental suffering which was the immediate and necessary consequence of the injury sustained." He specifically charged: "You are not to allow anything for psychological complaints but only for physical complaints."

The jury found that plaintiff had been injured by the negligence of defendants; that plaintiff was entitled to recover $5,800.00 for personal injuries and $200.00 for property damages. Plaintiff's motion to set aside the verdict upon the issue of damages was denied. From judgment on the verdict, plaintiff appeals, requesting a new trial on the issue of damages only.

*Yarborough, Blanchard & Tucker; Douglass and Douglass for plaintiff.*

*Smith, Leach, Anderson & Dorsett for defendants.*

SHARP, J. This appeal involves only a question of pleading, not the right of a plaintiff to recover for emotional disturbances precipitated by physical injuries. Upon proper allegations and medical proof as to causation, it is generally held that recovery for such a disturbance may be had. *Williamson v. Bennett,* 251 N.C. 498, 112 S.E. 2d 48 (recovery denied because no actual physical injuries); *Ford v. Blythe Brothers Co.,* 242 N.C. 347, 87 S.E. 2d 879; see, on the requisites of medical proof of causation, *Gillikin v. Burbage, ante,* 317, 139 S.E. 2d 753.

Plaintiff's evidence, viewed in the light most favorable to him, tends to show that after the automobile which he was driving was struck from the rear by the truck of defendants Ward and Markham, plaintiff developed a traumatic neurosis. Although none of the medical experts who testified used this term, the bizarre, metastatic symptoms detailed by plaintiff at the trial and to his physicians, who could find no physical basis for these complaints, are among the indicia of traumatic neurosis. This is a term loosely used to include a variety of emotional and nervous disorders which sometimes follow a physical injury and which cause pain as real as if it had a physical basis. 3 Lawyers' Medical Cyclopedia §§ 20.1, 20.3, 20.4, 20.12 (1959 Ed.).

Plaintiff has alleged that his nervous system was shocked and damaged, his ability to sleep permanently impaired, and that he has suffered excruciating physical and mental pain as a result of injuries sustained

in the collision on April 25, 1960. He has not, however, specifically alleged that his disorders and suffering are emotional rather than physical or organic in origin, *i.e.*, that he has become a victim of traumatic neurosis. May he recover for such an injury without an explicit averment of it? This is the question this appeal poses. If such an allegation is required, the judge correctly instructed the jury to allow plaintiff no damages for psychological complaints. The court cannot submit a case to the jury on a particular theory unless such theory is supported by *both* pleadings and evidence. Assuming, purely *arguendo*, that we have in this case the necessary proof of causation, "proof without allegation is as ineffective as allegation without proof." *McKee v. Lineberger*, 69 N.C. 217, 239; *accord, Calloway v. Wyatt*, 246 N.C. 129, 97 S.E. 2d 881.

The general rule with reference to pleading items of damages in personal-injury cases is this: Those injuries which are the natural and probable consequences of the hurt alleged in the complaint, and which are reasonably included therein, need not be set out in detail. The law will infer them from the facts set forth. Effects, however, which are not logical and necessary, and which do not ordinarily follow such injuries constitute special damages, which must be specifically pleaded. 15 Am. Jur., Damages, §§ 304, 311 (1938); 25 C.J.S., Damages § 135 (1941). Therefore, from an injury which necessarily causes physical pain the law assumes that the normal person will suffer some mental anguish, also. *Hargis v. Power Co.*, 175 N.C. 31, 94 S.E. 702. Although it is the better practice in a personal-injury action to aver specifically that plaintiff has suffered mental anguish as a result of his injuries (if such be the case), most courts, including this one, hold that "where a description of the injury itself is such as to indicate that pain and mental anguish would ordinarily accompany it, the specific allegation is unnecessary." McCormick, Damages § 88 (1935 Ed.); *accord, Hargis v. Power Co., supra;* 15 Am. Jur., Damages § 316 (1938).

Plaintiff contends that, he having alleged both physical pain and mental suffering, as well as severe shock to his nervous system, these allegations are a sufficient foundation for the recovery of damages for traumatic neurosis. We do not agree.

The purpose of averring that a plaintiff is afflicted with a certain condition or disease as a result of a defendant's actionable negligence is to give defendant notice that plaintiff is seeking compensation for the infirmities and discomfort attending it. A defendant is entitled to know from the complaint the character of the injury for which he must answer. The complaint, therefore, should disclose "all the facts which the defendant should know in order to make his defense" and thus pre-

vent surprise at the trial. *Barron v. Cain,* 216 N.C. 282, 283, 4 S.E. 2d 618, 619; *accord, Oberholtzer v. Huffman,* 234 N.C. 399, 67 S.E. 2d 263.

In *Connor v. Kansas City Rys. Co.,* 298 Mo. 18, 250 S.W. 574, plaintiff alleged that her entire body was strained, bruised, and contused; that she sustained a concussion of her spine; and that she would continue to lose sleep and suffer intense pain and mental anguish. In holding that evidence tending to show insanity was not admissible within this pleading, the court said: "Neither insanity, irrationality nor traumatic neurosis with its train of ills, is a necessary result of injuries such as are pleaded in the petition. Injuries to nerves do not necessarily so result, and a nervous condition does not necessarily include them . . ." *Id.* at 23, 250 S.W. at 576; *accord, Arkansas Power & Light Co. v. Toliver,* 181 Ark. 790, 27 S.W. 2d 985 (allegation of a broken rib, neck and back sprains, and a contusion on the back of the head, *Held,* not sufficient to admit evidence that plaintiff was suffering from a brain disease known as Friedman's Complex); *Chambers v. Kennedy,* 274 S.W. 726 (Mo.) (allegation of permanent injury to brain and entire nervous system, *Held,* not sufficient to admit evidence of epilepsy, which might or might not result from such injuries); *Waters v. City of Morgantown,* 110 W. Va. 43, 156 S.E. 837 (allegation of abdominal, head and neck injuries, which rendered plaintiff very nervous, *Held,* insufficient to admit evidence of insanity resulting from the accident in suit).

Although, as the testimony of one of the medical experts in this case indicates, traumatic neurosis sometimes ensues from a neck sprain such as plaintiff presumably suffered, yet it is not the necessary or the usual result. Often it is very difficult for medical experts to determine whether a plaintiff is malingering, *i.e.,* making a *"conscious* attempt to simulate some condition which is not actually present," or whether he is the victim of a neurosis, "which involves the *unconscious* production of a symptom so that the patient is unaware of its emotional origin." 3 Lawyers' Medical Cyclopedia § 20.16 (1959 Ed.). A defendant who must face a determination of this question is entitled to pleading-notice that the plaintiff seeks to recover damages for a psychoneurotic reaction.

Ordinarily, the question of the sufficiency of the pleadings in cases involving a traumatic neurosis arises upon objections to evidence of plaintiff's symptoms. Here, however, without objection, the jury heard all of plaintiff's evidence with reference to his symptoms. No question arose until defendants requested the court to charge the jury that it could not include damages for psychological injuries in any award to plaintiff. Defendants' strategy of permissiveness was based, we apprehend, upon their belief (1) that jurors, like most other people, are un-

sympathetic to a person who has no physical basis for his complaints and (2) that plaintiff would victimize himself by overstating his baroque complaints. "I pray you, sir, to understate your case, lest the full truth, falling upon untutored ears, deafen beyond belief." Whether the verdict reflects the success of defendants' strategy or the jurors' strict compliance with the court's charge, we must leave to conjecture. In any event, plaintiff has assigned no reversible error. The charge conformed to the rule of damages for personal injuries as laid down in *Smith v. Corsat*, 260 N.C. 92, 131 S.E. 2d 894, and the cases therein cited. Under the charge plaintiff was permitted to recover for all his physical and mental sufferings which were the immediate and necessary consequences of the injury sustained. Had plaintiff desired elaboration of his contentions with reference to lost wages and other items embraced by the rule, he should have especially requested it. *Peterson v. McManus*, 210 N.C. 822, 185 S.E. 462.

In the trial, we find

No error.